May it please the court. This appeal presents basically two questions. The first question, under Title VII in Section 1981, if a racial slur is uttered by a decision maker but not heard by the person about whom the decision is made, can an inference of racial animus nevertheless be legally sound? And the second question, under the Fair Labor Standards Act, if an employer does not actually follow the peace rate system meant to compensate an employee for both productive and non-productive time, can there still be said to be an agreement between the employer and employee such that overtime is not owed? And related to this question, if an employee complains about not being paid correctly under such peace rate system, does that complaint protect the employee from retaliation under the FLSA? That's the first question. In this case, a longtime and decorated Republic Services employee, my client, Mr. Ricky Lockhart, was terminated under a progressive discipline policy within only a few months of attending a nationwide company driving competition that they call the rodeo. He was chosen to represent San Antonio at the rodeo because he exemplified the best of the drivers in the San Antonio division, according to defendant Ryan Whiteside, who accompanied Mr. Lockhart to the rodeo. At the rodeo, Mr. Lockhart complained of the pay practices in San Antonio to company higher-ups, the corporate people that were there. And Mr. Whiteside admitted hearing that Mr. Lockhart had made these complaints about the pay practices, and he also admitted to having spoken with Mr. Lockhart about those complaints when they returned to San Antonio alongside the HR person for the center there. Ultimately, and importantly, the pay practices in San Antonio were changed to conform with what Mr. Lockhart had been advocating and in saying that they were not being paid correctly. Eventually, they started paying them correctly. Now, while Mr. Whiteside made final sign-off on all of the progressive discipline leading to Mr. Lockhart's termination, the decision maker that was recommending this discipline at each step of the progressive discipline timeline, including the ultimate termination decision, was defendant Kenneth Ramczynski. At least one witness, a co-worker to Mr. Lockhart named Mr. Juan Puga, testified to having heard Mr. Ramczynski use racial slurs about black people in both English and Spanish. And most importantly, for our purposes, Mr. Puga testified that Mr. Ramczynski both tolerated and at some points used such Spanish racial epithets to refer to Mr. Lockhart. Mr. Puga also testified that given his role within the company, he attended management meetings where the managers would discuss employees who made complaints against management as having what they were called, quote, issues, which meant that managers were to find reasons to write that employee up. Mr. Lockhart was identified as an employee with an issue after his return from the rodeo, according to Mr. Puga's testimony. Meanwhile, fellow black public services employee Robert Wilson testified that he heard from landfill supervisors Chewie Velma and Daniel Garza that, quote, this n-word is going to get fired because they were talking to other people in management, like Frank Franco, would tell them what's going on and he would tell them that this guy named Kenny had it out for Rick, and so they would take that out on Rick when they would see him. Franco would be saying this guy named Kenny has it out for Rick and they're trying to get rid of him. Notably, Daniel Garza, who would end up being the person who reported Mr. Lockhart for going through the side entrance to the landfill, told Mr. Ramczynski of this matter and put a written statement together to that effect. Mr. Ramczynski fired Mr. Lockhart for this infraction, though two other non-black drivers did the same thing on the same day, but they were not terminated, allegedly due to where they were in the progressive discipline policy. Now, admittedly, Mr. Lockhart testified to never having heard such slurs by Mr. Ramczynski or anyone else at Republic, but this was never a hostile work environment case, so that fact, while true, is really beside the point. Also admittedly, there is no evidence from any witness that Mr. Ramczynski made such slurs in conjunction with or even close in time to any of the discipline dispensed, but this was never a direct evidence case either, so that fact, too, is beside the point. This has always been a circumstantial evidence case, and as such, circumstances that could support an inference of racial animus must be considered, and at the summary judgment stage, such inferences must be that Mr. Ramczynski uttered racial slurs about black people generally and Mr. Lockhart specifically is a circumstance suggesting that racial animus infected Mr. Ramczynski's opinion of Mr. Lockhart and consequently the employment decisions Mr. Ramczynski made on behalf of the defendants about Mr. Lockhart's termination. To hold otherwise is to suppose that someone who feels comfortable using such racist language in the workplace is only occasionally a racist or at least not a racist when it legally counts, such as in granting benefits or dispensing discipline. Now, Lockhart argued to the district court that his situation was similar to an age discrimination summary judgment case analyzed by the Fifth Circuit in Godot versus National Oil-Varco, where ageist remarks were unquestionably made but did not meet the exacting four-part test set out in Brown versus CSC Logic for proving direct evidence of discrimination. In Godot, this court held that in a circumstantial case in which, quote, the discriminatory remarks are just one ingredient in the overall evidentiary mix, we consider remarks under the more flexible standards cited in Russell versus McKinney Hospital. Quote, to be relevant evidence considered as part of a broader circumstantial case, the comments must show, one, discriminatory animus, two, on the part of the person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision-maker. Here, our argument below to the district court was that the record unquestionably showed that Lockhart meets the Godot test. Ramzynski was primarily responsible for Lockhart's discipline and ultimate termination, as well as the racist comments attributed to him unquestionably show a discriminatory animus. Thus, under this more relaxed standard, Lockhart met his prima facie burden based on Ramzynski's comments alone. Now, in declining to apply this age discrimination Godot standard to Lockhart's Title VII in Section 1981 claims, the district court found that while the fourth prong of ADA prima facie standard has included the clause, otherwise discharged because of his age, that there was no published case adding that clause to the prima facie standard in a race discrimination case. However, this court's unpublished decision in Wallace v. Seton, Family of Hospitals, specifically cites Godot in a race discrimination context and held that in granting summary judgment to the defendant that, quote, the district court applied the wrong test, the stray remarks direct evidence test, to Brown's race-based comments, which were only offered as circumstantial evidence. Though unpublished, Wallace is one of the most recent cases in a long line of cases that show this court's common practice of using McDonnell-Douglas evidentiary concepts interchangeably between ADA and Title VII discrimination cases. And so, for that reason, it was error for the district court to refuse to use the Godot standard or to follow the unpublished standard cited in the circumstances here, where we unquestionably have testimony of the decision-maker making racist comments about the person whose decisions affected the plaintiff's employment with the defendant, and that those decisions, although not heard by the plaintiff, nevertheless are some circumstantial evidence that the employment decisions at issue were infected or tainted by racial animus. And, assuming no questions on that issue, I can move on to the second question. Okay. And I will just say, since I have only a minute remaining, the defendants do not contest below the fact that Mr. Lockhart complained of and said that the manner and means which he was being paid was incorrect, but they did say that the record has no evidence that the plaintiff ever complained he was not paid in full for all hours worked or this overtime pay was improperly calculated, and this is not so. The record shows the defendants changed the method for calculating Lockhart and other drivers' pay after Lockhart complained in March of 2017, and as discussed extensively in Lockhart's declaration, the method for counting the cans unquestionably affected his hourly pay, which is why Lockhart was complaining as much as he did. That Lockhart did not understand fully Fair Labor Standards Act or use those words is not indicative of his not being protected or not being entitled to be paid correctly. My time's ended. So, Julie, thanks. Oh, thank you. May I please the court? The EOC is participating in this case to urge this court to correct two discreet legal errors made by the district court. First, a Title VII plaintiff alleging racially discriminatory discharge is not required to offer comparators to establish a prima facie case. The text of Title VII says nothing at all about comparators or the type of evidence needed. It simply requires that an adverse employment action, like a suspension or termination, be made because of race or that race was a motivating factor in the decision. Green, the plaintiff in McDonnell Douglas, did not articulate a prima facie case using comparators, and the Supreme Court did not require such evidence, nor did the Supreme Court's decision in Fern Co, which elaborated on McDonnell Douglas framework and stated that McDonnell Douglas method of proof was never intended to be rigid, mechanized, or ritualistic. McDonnell Douglas is a burden shifting proof framework. It's an efficient way of focusing evidence in a particular case, given that direct smoking gun proof of discrimination is rare. The Supreme Court's repeatedly said that the specific elements of a prima facie case vary with the circumstances of a given case and are flexible and adapted to the facts. Establishing a prima facie case of discrimination is a minimal burden, not onerous, and its purpose is to eliminate the most common nondiscriminatory reasons for the plaintiff's rejection or termination or suspension. A Title VII plaintiff may use the prima facie case where the fourth element is that he was otherwise discharged because of race or that he was fired under circumstances that give rise to an inference of unlawful discrimination, but the district court here ruled that this more general catch-all was only available under the ADEA, but not Title VII. There are a number of cases in the circuit that say this, all postdating the Supreme Court's decision in O'Connor v. Consolidated Coin Operators, which held that even though a common prima facie case under Title VII requires showing that the terminated employee is replaced with someone outside the protected class, under the ADEA, the comparator need only be significantly younger. O'Connor did not mention Title VII at all, and nothing in the case should be read to require any change in the application of a flexible, variable prima facie case under Title VII. Like the ADEA, which was based on Title VII, Title VII similarly does not require, as part of a prima facie case, that the plaintiff be replaced with someone outside the protected class. There has to be some evidence of disparate treatment, but a decision maker's toleration and use of egregious racial slurs in the workplace is probative evidence that discriminatory animus infected a termination decision. Here, the district court aired an excluding evidence of slurs tolerated and used by Kenneth as circumstantial evidence of race discrimination. Both Ramzynski's toleration and frequent use of egregious racial slurs, including referring to Lockhart using the term pinche meate, and Garza's use of racist slurs to describe Lockhart, meet this court's test for considering disparaging remarks as circumstantial evidence of race discrimination. Terms such as the n-word and the other words used in this case were made by a person primarily responsible for the challenge decision. These slurs, as well as Garza's mistreatment and role in Lockhart's termination, are evidence of hostility towards African Americans at Republic and contribute to a rebuttable presumption that Lockhart was terminated because of his race. Testimony of a decision broad based racial animus or bias is simply corroborating evidence that the bias affected the decision challenged. Few would doubt that a supervisor separates his expressed bias of black subordinates away from decisions about their suspension and termination. So Garza and Ramzynski's frequent use of the n-word and other slurs to refer to Lockhart and Garza's decision to allow Lockhart to enter the exit gate and then report him, knowing that Ramzynski wanted to get rid of him, corroborates that racism toward Lockhart tainted his termination decision. All these slurs and mistreatment bear on causation. They show disparate treatment because they're evidence from which one can refer Ramzynski fired Lockhart because of his race. Whatever evidentiary route a plaintiff chooses, that is the essential question than the McDonald scheme is getting at. I see my time is up. So we are urging this court to correct these legal errors. Thank you, Ms. Gantz. Ms. Kim Meyers for Republic Services. My apologies. Can everyone hear me? Thank you, Your Honor, and good morning. May it please the court. This court should affirm the district court's well-reasoned 68-page opinion, which correctly concluded that plaintiff's claims fail as a matter of law. Now, as a preliminary matter, I think it's important to begin with pointing out that there is no credible evidence in the record that raises an inference of discrimination, even under the standard plaintiff advocates for here. I direct the panel to the EEOC's brief in pages 5 to 8 and appellate's brief in pages 18 through 20. And when you read those pages, you will learn a few things. Among those things, you'll learn that And if you review the record on appeal at pages 400 through 401, you'll see that plaintiff testified the only person he believed discriminated against him was Mr. Ramczynski, the operations manager. And then he went on to make clear that he didn't believe Mr. Ramczynski discriminated against him because of his race. Turning to the only evidence of racial slurs in the record supported only by The majority of the alleged slurs are attributed to employees of the landfill, and that matters here. To be clear, Mr. Ramczynski was not employed by the landfill, nor was plaintiff, nor did Mr. Ramczynski work out of the landfill. Mr. Ramczynski worked at Republic Services of San Antonio. It's a separate entity in a separate location. Now, the only remarks actually attributed to Mr. Ramczynski are alleged by former employee Juan Puga. And if you look at record on appeal pages 756 and 814 through 815, you'll see that Mr. Puga's testimony was that racial slurs were used in reference to plaintiff in Mr. Ramczynski's presence, and I'm quoting from his testimony, sometimes he would even say the words. So even Mr. Puga didn't testify as to having personal knowledge of any racial remarks directed at It's simply inefficient, insufficient. In pages 38 through 42 of his opinion, Judge Rodriguez considered the evidence proffered by plaintiff, and he correctly determined that the testimony, and I'm quoting from his opinion, concerning Garza and Filma, others at the landfill, and other workers at Republic Services of San Antonio does not help plaintiff establish that race was a motivator for defendant's employment decisions, as they are not specific as to time, place, and context, and were not made by persons responsible for the challenged employment action, or by a person with influence over the decision maker. Judge Rodriguez cited the Reid case, which is also cited in the EEOC's brief. And that case states that vague allegations untethered to the employment decision at issue are insufficient to create a fact issue. And that's what we have in the case here. Ms. Myers, you know, there was some argument from the other side about what is the proper formula for a prima facie case. Now, that's all very interesting. We could, however, arguably dispose of this case by saying there was a legitimate, non-discriminatory reason for the action, and then it's not, and there's no evidence of pretext. So my question is, with respect to the pretext question, is there any evidence of pretext aside from the discriminatory remarks, the racist remarks? So I'm glad you asked. There was some evidence from disgruntled former employees that they believed that they were discriminated against at the landfill, by landfill employees. But importantly, Judge Rodriguez poured through all of the circumstantial evidence. So despite the implication that he did not consider that evidence, he fully considered it and determined that the plaintiff, Mr. Lockhart, was unable to meet his burden to show substantial evidence of pretext in this case. So even if this panel determined that it could reshape the Title VII prima facie case burden that's been in place for decades, by the way, and pursuant to Supreme Court rule of orderliness, summary judgments should still be affirmed. So these arguments are really... I take it, not, I don't mean to put words in your mouth, I take it you don't think this panel has the authority to, as you put it, reshape the prima facie formula. Why do you argue that? Why don't we have the authority to do that? Your Honor, I don't believe that you have authority to And in fact, this very issue was recently considered by this court in Stanley v. Rogers in 2017, and I believe, Your Honor, Judge Wiener, that you were even on that panel. And in that Stanley case, the panel concluded that because there was no intervening change in the law, summary judgment was appropriate on the plaintiff's race-based discrimination claim because plaintiff's argument was foreclosed by Fifth Circuit precedent. And that's exactly what we have here. There's been no intervening change in the law that would allow this panel to overturn previous panel decisions, which are, there's a plethora of them, identifying the differences between the ADEA standard and the Title VII standard, which does, in the fourth prong, require comparator evidence. And for good reason, by the way, because Title VII disparate treatment claims are based on evidence that somebody was treated disparately, meaning they're comparative by their very nature. Let me ask you this. I understand that your position is that Mr. Lockhart was fired for four violations in less than 12 months, and that all had to do with seeking higher pay. Can you enlighten us on that? Absolutely, and I'd like to correct that just a little bit. But what happened, first of all, Your Honors, there was not just a few months between when Mr. Lockhart, the plaintiff, went to the competition in Arizona, and when he was terminated, there were eight months between that time. But talking about the four disciplinary actions that occurred leading up to Mr. Lockhart's termination, they were not all related to his complaints of pay. So first, plaintiff received a documented verbal warning after he falsified his pay records, and that was related to his complaint that he didn't like the rate at which he was being paid for causing approximately $4,000 in avoidable damage to his truck. Now, it's important to note that the warning stemmed from the diagnosis of a third party. After plaintiff notified, plaintiff was the one who notified Republic Services of San Antonio that there was something wrong with the truck. The third disciplinary action was when plaintiff received a three-day suspension for to follow directions given by the maintenance shop manager and for also failing to wear mandatory personal protective equipment. Note that the maintenance employee involved in that issue was also disciplined, and that's at Record on Appeal 597. Fourth, and finally, plaintiff was terminated when he jeopardized his safety, he jeopardized the safety of others, and he jeopardized defendant's under the Texas Commission on Environmental Quality that allows them to dump items at the landfill. And this was after he impermissibly and dangerously entered the landfill through an exit in a 60,000 pound truck. And of note here is that plaintiff admits he drove through the exit. That's at Record on Appeal 1,233. And further, this disciplinary action was the result of the landfill's lead man. His name was Daniel Garza. Daniel Garza reported plaintiff's dangerous conduct to the landfill's operation manager, Frank Franco. Mr. Franco, in turn, reported the dangerous conduct to Mr. Radzinski. Now, neither Mr. Garza or Mr. Franco had a supervisory role over plaintiff, and they didn't play any role whatsoever in making decisions about disciplinary actions for plaintiff. So to accept Plaintiff's version of the facts as true, this court and the underlying court would have had to believe that there was any chance that of this elaborate conspiracy across entities and supervisory employees versus subordinate employees. And because defendant did articulate a legitimate non-discriminatory reason for terminating plaintiff, the burden then shifted back to plaintiff to demonstrate, and it's not just evidence of pretext, it's substantial evidence of pretext. And he simply failed to do so here. As I stated earlier, Judge Rodriguez poured through the circumstantial evidence, and he correctly determined that it was insufficient. Also, the record is clear that Mr. Radzinski did not act alone in suspending and terminating suspensions and terminations of employment, and General Manager Ryan Whiteside also signed off on the disciplinary actions. And then finally, there's just no evidence that any supervisor at the landfill or any defendant was aware that drivers other than plaintiff and his alleged comparators Mr. Martinez and Mr. Lopez ever entered the landfill through the exit gate. They were the only ones, and all three of those individuals were disciplined. So for all of these reasons, Your Honor, summary judgment on plaintiff's discrimination claims should be affirmed. Unless the panel has questions regarding the Title VII issue, with your permission, I'll turn to plaintiff's FLSA claims. Thank you. I'll move forward. Pardon me? I thought you referred, I'm sorry. Are you finished? I'm finished with the Title VII discussion, and with your permission, I'd like to move on and address the FLSA claims. So, Your Honor, reviewing the evidence of record, the District Court correctly concluded that plaintiff's piece rate was permissible under the FLSA, and that's because plaintiff understood his piece rate was intended to cover all hours worked by him. He provided written acceptance of the pay and that's at record on appeal 559 through 560. He was paid on a piece rate for over five years, and although he wasn't shy about complaining about his rate of pay, there's no evidence that he ever claimed that he wasn't being paid for all hours worked, and even as Mr. Evans explained, Mr. Lockhart was complaining about the rate at which he was paid for certain tasks. He was not that he wasn't paid for all hours worked. Judge Rodriguez aptly noted in his opinion, granting summary judgment, that plaintiff didn't separate productive and non-productive time on his route sheets, and that's because he understood that his pay was intended to compensate him for all hours worked. I think it's also important to spend less than a minute on plaintiff's declaration that was submitted after his deposition and after defendants filed a motion for summary judgment, and in that declaration, he claimed he didn't understand he was paid on a piece rate for the first time, but that same declaration admits his understanding. Looking at record on appeal 1795, Mr. Lockhart testified that the more cans he picked up and or the less time he took to pick them up, the more he made per hour, so he did understand the piece rate system, and he acknowledged compactors require much more time than regular boxes, which also demonstrates he understood his piece rate was intended to cover all hours worked, and then finally and most importantly, he stated, and I'm quoting, I was paid on my productivity not based solely on how many hours I worked. So plaintiff didn't just understand the piece rate compensation, he agreed to it, and he was actually happy about it. For example, after plaintiff advocated for a change in the haul rates, not in the way in a change in the way in which he was paid, and they were changed by the way, plaintiff testified that he was really happy at that point, even though he was still being paid on a piece rate basis that covered both productive and non-productive hours. That's it record on appeal 469, and just to make sure it doesn't get lost in the shuffle, I want to draw the panel's attention to a Department of Labor opinion that was issued just two weeks after we submitted our brief, as luck would have it. We did submit the supplemental authority to the panel, but just in case, I want to make sure that the court does have available to it the Department of Labor's opinion letter 2020-17. Now, despite the Biden administration having withdrawn several prior Department of Labor opinions, this one has not been withdrawn, and it makes clear that a written agreement is not required, just in case the court was wondering about that issue. So, the FLSA claims should be affirmed. Summary judgment should be granted on behalf of all the defendants, and then on a final note, the district court summary judgment on plaintiff's retaliation claims should also be I think that's clear. His complaints are about his rate of pay, and that's just not protected activity, because they are complaints that Republic Services of San Antonio violated the FLSA. To clarify with the use of an analogy in the context of an hourly employee, suppose Mr. Lockhart made $10 an hour, and he complained that he should make $15 an hour. That's a complaint about his pay, not a complaint that the FLSA was violated. And here, Mr. Lockhart was simply complaining that he wanted a higher rate for certain tasks, not that there was an FLSA violation. In fact, here the record contains no evidence that plaintiff ever complained about his compensation being illegal, potentially illegal, or even inconsistent with the FLSA. And if you'll note in the record at 494 and pages 1680 through 1681, it's clear that plaintiff can't offer any evidence that his supervisors viewed his complaints as related to any alleged FLSA violation. They weren't on notice. In fact, the record makes clear that Mr. Whiteside and Mr. Ramczynski didn't view plaintiff as complaining about any kind of legal violation at all. They viewed his complaints as raising issues about his rate of pay, which is what they were. Judge Rodriguez agreed with us, and in analyzing plaintiff's retaliation claims, he noted, and again I'm quoting from his 68-page opinion, plaintiff complained that he should be getting paid more for subcontainers, which ultimately affected his straight pay, and thus his overtime pay amounts. But that is true in all cases where an employee complains that they are not getting paid enough, and that's what we have here. But even if plaintiff had engaged in protected activity, his retaliation claim would nevertheless fail because Republic Services of San Antonio, as we discussed earlier, articulated a legitimate non-retaliatory reason for the termination of his employment. There's also insufficient evidence to establish a causal connection between plaintiff's pay and his termination. Just by way of example, and I mentioned this earlier, the last two disciplinary actions that plaintiff received were the results of reports from third parties who were wholly unaware of Lockhart's complaints. So if the panel has any questions regarding the FLS-8 questions, I'm happy to address them. I'd like to ask you a question, not directly, but related to that. But plaintiff and amici suggest that requiring evidence of similarly situated comparators conflicts with the spirit of McDonnell Douglas. What is your position on that? The position is that long-held precedent in this court, and by the way, several others, demonstrates that it's not against the spirit. There are many avenues upon which plaintiff could have proceeded under his claims, as Mr. Evans recognized. There are various avenues such as hostile work environment claims and direct evidence claims. But when you're bringing forth a case under circumstantial evidence, there must be some valid inference that there was disparate treatment. Because again, Title VII disparate treatment claims are comparative in nature. Thank you. Mr. Evans, you have five minutes on the vote. I think you're muted, Mr. Evans. So sorry, Your Honor. Insofar as the comment that was made about the fact that there's no comparative evidence in this case, we don't believe that's necessarily so. Two non-Black drivers engaged in the exact same misconduct by going through the side gate on the day that Mr. Lockhart was terminated. The argument for why they were not likewise terminated on that day for that exact same conduct was because where they were in the progressive discipline for each of them. We have tendered a chart, chart number eight, which shows comparative evidence as between two, and we believe that even considering that as comparative evidence, that they were similarly situated to Mr. Lockhart sufficient such that a jury should make the determination of whether or not he was treated fairly and not the judge at summary judgment stage. So there is comparative evidence. What we believe also though is that even independent of that comparative evidence, or at least when you're considering that comparative evidence, given the commonality of Mr. Amzinski being the decision maker as to all of that discipline, right? And that's shown in the disciplinary documents that we submitted. When you consider that he was the common decision maker as to all of those individuals, as to all of those, all of those discipline incidents, the fact that there were racial comments attributed to him in the workplace, whether or not Mr. Lockhart ever heard it, or whether or not they were made close in time, or as a part of the disciplinary decisions challenged here, that is still circumstantial evidence that should be considered at this point, or at least should allow a jury to understand or hear from Mr. Amzinski why he's able to parse between using that kind of language, but isn't willing to call it straight, you know, down the line balls and strikes when he's considering employment decisions involving his black employees. So the fact is, is that if we, let's imagine the circumstance where we have no comparative evidence of any kind, but instead during the course of discovery, it's proven that the decision maker in question has a litany of social media posts where he talks about his animosity toward a given protected group, right? Never does it at the workplace, no evidence that ever happened at the workplace. The question then would become, could a jury infer from the fact that this person has made these kinds of comments completely outside of the context of the workplace, but nevertheless made it about the person who's making a complaint from the protected group, would that person be entitled to at least have a jury consider whether racial animus infected the decision? And so we believe that the McDonnell Douglas standard is a standard. It's not a straight jacket. It is not supposed to be meant in such formulaic way to where the court cannot see the forest for the trees, right? So under the circumstances, one could name every genus and species of a given set of trees, but you still have to understand that it's a forest at the end of the day. And we believe that in this instance, the forest at least, given the evidence adduced, that there were these statements made by the decision maker at issue that Mr. Lockhart is at least entitled to his day in court on that issue. There was mention of the fact of the credibility of the witness, Mr. Puga, that he's not, he's disgruntled. He's not a, he's not a person who should be believed, but respectfully, the credibility determinations are things that the jury should make a credibility on. And those are fodder for bias cross-examination, rigorous cross-examination on the bias that Mr. Puga may have to lie about Mr. Ramczynski. Similarly, Mr. Ramczynski could show up and say, it's an absolute lie that I ever said any of these kinds of things, and I totally reject and resent the fact that anybody would ever say that about me. But here, again, that's a decision or that is testimony that should be heard by a jury and put through the crucible of a trial versus merely the pages of summary judgment motion practice. I will say quickly with respect to the underlying Fair Labor Standards Act issue, and this is briefed extensively in our briefing, on the Fair Labor Standards Act issue, the, and following on the opinion letter that was recently issued, which has not been rescinded yet, that depends upon the existence of a mutual agreement. You still have to show the existence of a mutual agreement. It can be oral. It doesn't have to be documented or written. It can be oral, but it has to at least that the agreement does not exist or there is no agreement if you don't actually follow the agreement. My client claims that he was consistently not paid according to what he understood he was supposed to be paid for the productive and non-productive time, the piece rate system that was proposed. What he's saying is I never got paid that way. So the default is that he's to be paid his straight time and his overtime. The exception to that rule is a piece rate system, which was not followed, and my time is up. Thank you, Mr. Evans. This case will be submitted and this panel will adjourn until tomorrow morning.